3 Va.App. 418 (1987)
 350 S.E.2d 229
 3 VLR 1161
MICHAEL J. GARDNER
v.
COMMONWEALTH OF VIRGINIA
Court of Appeals of Virginia
November 5, 1986; As amended March 18, 1987
Daniel B. Krisky, for appellant.
W. Mark Dunn, Assistant Attorney General (Mary Sue Terry, Attorney General, on brief), for appellee.
Defendant appealed his conviction for first degree murder. He argued that the trial court erred in reassembling the jury after initially announcing a mistrial and that the evidence was insufficient to support the conviction (Circuit Court of Arlington County, Thomas R. Monroe, Judge).
The Court of Appeals affirmed, holding that the trial court did not err in reassembling the jury after it had been discharged because in the interim period, the jury never left the presence of the court. The Court also held that the evidence was sufficient to support the conviction.
KEENAN
KEENAN, J. -- Michael J. Gardner was convicted of first degree murder and sentenced, in accordance with the jury's verdict, to twenty-five years imprisonment. The issues presented in this appeal are: (1) whether the trial court erred in continuing to poll the jury after one juror stated that he did not agree with the verdict; (2) whether the trial court erred in giving the jury the so-called "Allen" [1] instruction after the poll revealed the identity of the lone dissenting juror; (3) whether the content of the instruction improperly emphasized the jurors' duty to agree; (4) whether the court erred in reassembling the jury after initially announcing a mistrial; and (5) whether the evidence was sufficient to support the conviction. We do not address the merits of the first three issues set forth above because trial counsel failed to properly preserve those issues in accordance with Rule 5A:18. [2] Based upon our resolution of the two remaining issues, we find no error and affirm Gardner's conviction.
At trial, Gardner did not dispute that he shot and killed the victim, Orlando Dominquez, on May 10, 1984. He asserted, however, that he was acting in self-defense. Two weeks before the incident, Dominquez had begun cohabiting with Gardner's former girlfriend, Carla Keastead. Gardner testified that before going to Keastead's apartment on May 10, 1984, he spoke with Dominquez on the telephone. He asked to talk to Keastead because he needed her permission to bill a long distance telephone call to her number. Gardner testified that Dominquez refused to let him speak with Keastead and made insulting remarks to him. Gardner further testified that he then went to Keastead's apartment, arriving at approximately 9:24 p.m., and knocked on the door. Dominquez, Keastead, her twelve-year old son Tony, and Melito Garcia, a nine-year old boy, were inside the apartment at that time.
Gardner testified that after knocking on the door, he heard a man inside the apartment ask who was there. Gardner answered that he was a police officer. Although employed as an officer with the Federal Protective Service at the time of the incident, Gardner was not on duty that night. Gardner testified that the man inside the apartment told him that he could not see Ms. Keastead. Gardner stated that upon hearing this, he began to walk away. He stated that he was not angry at that time. He further testified that as he was walking away from the apartment, he heard noise coming from the kitchen and heard the door open behind him. Gardner testified that Dominquez came into the hall and stated: "Nigger, I am going to cut your f heart out." He stated that Dominquez then moved toward him, holding a big knife. Gardner testified that as he was removing his gun from his leg holster, it discharged accidentally. Gardner, who was several inches taller than Dominquez, testified that he was still raising the gun from the holster at the time it discharged. He further stated that, had the gun not discharged accidentally, he "would have shot him center mass."
Elizabeth Witherspoon, who resided in an apartment on the same hall as Keastead, testified that at about 9:30 p.m., she heard loud knocking on someone else's door. She stated that the knocking sounded like it was being done with something other than a human fist. Witherspoon also testified that almost simultaneously with the knocking, she heard a loud voice calling for someone to come outside. A few seconds later, Witherspoon heard a shot. Ronald Cohn testified that at approximately 9:45 p.m., he was in the building parking lot and saw Gardner come through the back door of the building and run toward the street.
John Lawrence, another resident of the building, testified that he heard a loud noise about 9:30 p.m., and upon going out into the corridor, he observed Dominquez lying on the floor. Dominquez did not have a shirt on and was bleeding from his chest and back. When the police arrived in response to Keastead's emergency call, they found in the hallway a knife covered by a plaid shirt. The officers observed a bullet hole which was located forty inches up from the floor in Keastead's door. The autopsy report showed that Dominquez was five feet, six inches tall, and that the bullet passed through his body at a slightly downward angle.
Nine-year old Melito Garcia, who was inside Keastead's apartment at the time of the shooting, testified that he heard the man who was knocking on the door say: "I'm going to kill you." Garcia testified that Dominquez appeared frightened and told everyone to go into the bedroom.
At the trial, both Carla and Tony Keastead gave accounts of the incident which differed from the statements they made earlier to the police. Both testified at trial that they were frightened at the time they gave their initial statements to the police. Carla Keastead testified that she lied to Officer Joseph Pope at the scene of the incident because he was physically shaking her at the time. Officer Pope denied touching Keastead or intimidating her in any manner. The jury also heard evidence that Keastead and Gardner resumed dating each other approximately two weeks after Gardner killed Dominquez.
Carla Keastead testified that at about 8:00 p.m. on the night of the incident, Gardner called and asked her to go out for a cup of coffee. She refused. Shortly thereafter, Gardner called again and requested permission to bill a long distance telephone call to her number. Keastead gave him permission. Keastead testified that some time later Gardner began knocking on her apartment door. According to her, Dominquez asked who was there. Gardner then responded: "This is a police officer." Keastead testified that Dominquez recognized Gardner's voice and shouted: "I am going to kill you, you son of a bitch." Keastead said that she heard Dominquez take something from a kitchen drawer and go out the door. She further testified that while calling the police, she heard a gunshot.
At the scene of the crime, however, Keastead told Officer Pope that when Dominquez asked who was knocking on the door, Gardner responded that he was a police officer and also stated: "You don't have reasons to ask me questions, spic." Keastead told Officer Pope that Gardner then stated: "Nobody is going to keep me from coming through." Keastead said that Gardner next told Dominquez to meet him out in the parking lot. Keastead also told Pope that when Dominquez suggested that they settle the matter right there, Gardner responded, saying: "I am not that stupid to do anything like that in the apartment where I can get in trouble."
Keastead gave still a different statement to the police later that night. In this version, she stated that prior to the shooting, Gardner yelled through the door: "Nobody is going to keep me out of this house. I suppose you're in f her." Keastead also said that while Gardner was trying to get into the apartment, Dominquez was trying to settle the matter. According to Keastead, Gardner persisted, saying: "You're a nigger, you're a spic, uh, you're not man enough to face me." At the trial, Keastead testified that this version was a lie and that she had been afraid of the police when she made the statement.
Tony Keastead testified that upon hearing Gardner's voice that night, Dominquez threatened: "I am going to kill you. I am going to cut your heart out." Tony Keastead also stated that he heard a kitchen drawer open and then heard a gunshot. He testified that he lied earlier when he gave the police a statement which was in conflict with his trial testimony. He stated that he lied to the police because he was afraid and tired. At the trial, he also denied talking to his mother or Gardner about what he was going to say in court.
The case was submitted to the jury on October 11, 1984. After allowing the jury to begin their deliberations, the court discharged them for the evening. The next day at 12:25 p.m., the court received a note from the jury asking: "Must our decision be unanimous? We are 11 to 1 for disposition." The court responded that the verdict must be unanimous. At 12:44 p.m., the jury announced that it had reached a verdict. When polled, the jurors began to answer with the phrase: "I support the group decision." The court interrupted the poll, stating: "Is this your verdict, answer yes or no. Start over." Upon being asked this question, Manuel Serra, the third juror, answered: "No." The poll continued without objection. All remaining jurors responded: "Yes."
The defendant moved for a mistrial. The court granted the mistrial and excused the jury. Immediately thereafter, and before the jury left the courtroom, the prosecutor asked to address the court. At this time, the court ordered the jury to go back to the jury room. The prosecutor then argued that the court should give an "Allen" instruction because there was no indication that the jury was deadlocked. The court reversed its decision to grant the mistrial, ordered the jurors back into the jury box, and read them a modified "Allen" instruction. The defendant's counsel objected to the court's decision to reverse its previous ruling granting the mistrial. Counsel stated: "I would like the record to indicate our objection to your reversal." The case concluded at 2:20 p.m., when the jurors returned a unanimous verdict of guilty.
Gardner argues that the trial court erred in continuing to poll the jurors after one juror stated that he did not agree with the verdict. He also argues that both the timing and the content of the "Allen" instruction were improper. At trial, however, Gardner did not object to any of these alleged errors. Rule 5A:18 provides in pertinent part:
No ruling of the trial court . . . will be considered as a basis for reversal unless the objection was stated together with the grounds therefor at the time of the ruling, except for good cause shown or to enable the Court of Appeals to attain the ends of justice. Rule 5A:18 serves an important function during the conduct of a trial. It places the parties on notice that they must give the trial court the first opportunity to rule on disputed evidentiary and procedural questions. The purpose of this rule is to allow correction of an error if possible during the trial, thereby avoiding the necessity of mistrials and reversals. To hold otherwise would invite parties to remain silent at trial, possibly resulting in the trial court committing needless error. In order to avoid this result, we adhere to the policy of placing an affirmative duty on the parties to enter timely objections to rulings made during the trial. Since Gardner failed to note an objection to either the continuation of the jury poll or the timing and content of the "Allen" instruction, we do not reach the merits of these issues on appeal.
Gardner also argues that the trial court erred when it reversed its decision to declare a mistrial and reassembled the jury. In support of this argument, he cites Melton v. Commonwealth, 132 Va. 703, 111 S.E. 291 (1922). In Melton, the jury returned a verdict of guilty in a rape case and fixed punishment at three years in the penitentiary. After the jury was discharged and left the courtroom, the judge realized that the jury set a punishment less than the penalty provided by statute. He then recalled the jurors from the jury room where they had gone to collect their attendance fees. On the court's further instruction, the jury reconsidered the sentence and fixed the defendant's punishment at five years imprisonment. The Supreme Court held that under these facts, the trial court erred in reassembling the jury. Central to the court's holding was the fact that the jury left the presence of the trial court. The court stated:
It is sufficient that the jury had left the presence of the court, and no evidence of what transpired thereafter was admissible. So long as the whole jury are in the actual and visible presence of the court, and under its control, an inadvertent announcement of their discharge may be recalled as a matter still in the breast of the court, but not thereafter. Id. at 712, 111 S.E. at 294.
Applying the holding of Melton to the case before us, we find that the trial court did not err in reassembling the jury moments after its discharge because during this period of time, the jury never left the presence of the court. The trial court specifically stated this fact for the record: "The jury remained in the jury box except for two or three members who had stepped not more than six feet away." This statement of fact made by the trial court makes it clear that the jury, notwithstanding its discharge, continued to remain in the actual and visible presence of the trial court and under its control.
This test established in Melton was reaffirmed by the Supreme Court in LeMelle v. Commonwealth, 225 Va. 322, 302 S.E.2d 38 (1983). There, the court stated:
This Court has consistently applied the rule, followed generally in most jurisdictions, that once a jury is discharged and leaves the presence of the court, it cannot be reassembled to correct a substantive defect in its verdict. Id. at 324, 302 S.E.2d at 39 (emphasis added). Therefore, under the test established in Melton, and reaffirmed in LeMelle, we find that the trial court did not err in reassembling the jury after it had been discharged because in the interim period, the jury never left the presence of the court.
We next consider Gardner's argument that the evidence presented was insufficient to convict him of first degree murder. First degree murder is defined by Code | 18.2-32 to include "[m]urder . . . by any willful, deliberate, and premeditated killing." Gardner contends: (1) that there was no credible evidence upon which the jury could find that the killing was willful, deliberate and premeditated; and (2) that the jury's failure to accept his theory of self-defense is plainly contrary to the evidence produced at trial. We disagree with both of these contentions.
On appeal, we review the evidence in accordance with the standard set forth in Higginbotham v. Commonwealth, 216 Va. 349, 218 S.E.2d 534 (1975):
Where the sufficiency of the evidence is challenged after conviction, it is our duty to consider it in the light most favorable to the Commonwealth and give it all reasonable inferences fairly deducible therefrom. We should affirm the judgment unless it appears from the evidence that the judgment is plainly wrong or without evidence to support it. Id. at 352, 218 S.E.2d at 537 (citations omitted). Further, in Toler v. Commonwealth, 188 Va. 774, 781, 51 S.E.2d 210, 213 (1949), the Supreme Court stated: "[T]he weight of the evidence or the inferences to be drawn from circumstances, is always a matter for the jury, under proper instructions from the court." Applying these principles to the case before us, we find that there was ample evidence in support of the jury's verdict.
Gardner and Carla Keastead cohabited for one and one-half years. After their estrangement, Keastead began living with the victim, Orlando Dominquez. Further, Gardner testified that Dominquez insulted him during their telephone conversation on the night Dominquez was killed.
Elizabeth Witherspoon testified that at about 9:30 p.m., she heard loud knocking on Keastead's door, as well as a loud voice calling for someone to come outside. Melito Garcia's testimony provided evidence that Gardner was angry with Dominquez prior to the shooting. According to Garcia, Gardner told Dominquez: "I'm going to kill you." The jury was entitled to accept this testimony and find that prior to the shooting, Gardner became angry and jealous of Dominquez and as a result, planned to kill him. The jury was also presented with evidence contradicting Gardner's assertion that his gun discharged accidentally as he was raising the weapon from his leg holster. The autopsy report showed that the bullet traveled at a slightly downward angle through the victim's chest. From this fact, the jury was entitled to infer that Gardner was not truthful about the manner in which the shooting occurred. The jury was also entitled to reject the testimony of Karla and Tony Keastead. Their testimony conflicted with their prior statements to the police. In assessing the Keasteads' credibility, the jury was entitled to consider the fact that Carla Keastead and Gardner resumed their relationship two weeks after Dominquez was killed. Therefore, based on our review of all the evidence presented, we find that the jury was entitled to conclude that Gardner intended to kill Dominquez and did so upon premeditation.
The jury was also entitled to reject Gardner's claim of self-defense. The trier of fact determines the weight of evidence in support of a claim of self-defense. Yarborough v. Commonwealth, 217 Va. 971, 979, 234 S.E.2d 286, 291-92 (1977); Dodson v. Commonwealth, 159 Va. 976, 984-85, 167 S.E. 260, 262 (1933). Thus, the jury was entitled to disbelieve the evidence offered by Gardner in support of his theory of self-defense, particularly in light of the evidence that Gardner, and not Dominquez, was the aggressor.
In summary, therefore, we find that Gardner failed to preserve for appeal the issues of continuation of the jury poll and the timing and content of the "Allen" instruction; that the trial court did not err in reassembling the jury after reversing its decision to grant a mistrial, and that the evidence was sufficient to support the jury's verdict of first degree murder. Accordingly, the judgment of conviction is affirmed.
Affirmed.
Benton, J., and Moon, J., concurred.
Affirmed.$89:#GGG#
NOTES
[1] The so-called "Allen charge" is based upon the United States Supreme Court decision in Allen v. United States, 164 U.S. 492 (1896). The Virginia Supreme Court has approved use of the "Allen" instruction. Poindexter v. Commonwealth, 213 Va. 212, 215, 191 S.E.2d 200, 203 (1972).
[2] We note that appellant's counsel did not represent Gardner at trial.