COURT OF APPEALS OF VIRGINIA

Present:   Judges Benton, Elder and Frank
Argued at Chesapeake, Virginia


TYRONE L. WATERS
                                                    OPINION BY
v.        Record No. 1893-03-1                JUDGE ROBERT P. FRANK
                                                    AUGUST 24, 2004
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF VIRGINIA BEACH
A. Joseph Canada, Jr., Judge

Andrew G. Wiggin for appellant.

Michael T. Judge, Assistant Attorney General (Jerry W. Kilgore,
Attorney General, on brief), for appellee.


Tyrone L. Waters (appellant) was convicted after a jury trial of malicious wounding while

part of a mob, in violation of Code § 18.2-41.[1]  On appeal, he contends the trial court erred in (1)

denying his motion, based on the principle of res judicata, to reduce the malicious wounding by

mob charge to assault and battery by mob, (2) disallowing cross-examination of a co-conspirator

regarding his competency evaluation, (3) allowing another co-conspirator to invoke his Fifth

Amendment right against self-incrimination, and (4) denying his motion to set aside the verdict

based on the Commonwealth's failure to disclose exculpatory information regarding a

co-conspirator's competency evaluation.  For the reasons stated below, we affirm appellant's

conviction.

_____

[1] Although appellant was charged with various other crimes, he was convicted of only
this offense.

I.  Res Judicata

Appellant and several other people were arrested and charged with various crimes, including malicious wounding by mob.  David Hicks, one of the co-conspirators, was tried in a bench trial prior to appellant's jury trial.  The trial court found Hicks guilty of the lesser-included offense of assault and battery by mob.  Appellant filed a pretrial motion based on Hicks's trial, arguing he was "a person so identified in interest with Hicks that [he] represents either the same legal rights related to culpability or a portion of the same culpability as did Hicks."  He claimed the principle of res judicata prevented his conviction of any greater offense than assault and battery by mob and asked the court to reduce the malicious wounding indictment accordingly.  The trial court heard argument and denied the motion.

Appellant cites no cases applying the principle of res judicata in the context of co-conspirators.  He argues, however, that Highsmith v. Commonwealth, 25 Va. App. 434, 489 S.E.2d 239 (1997), allows this Court to extend the principle to this context.  We disagree.

In Highsmith, this Court considered whether a defendant, using the principle of res judicata, could argue that the general district court's dismissal on the merits of a misdemeanor charge prohibited a trial in the circuit court on the same charge involving the same incident.  Id. at 437-38, 489 S.E.2d at 240-41.  The Court held that res judicata applies in criminal cases where "the second prosecution of a criminal case [against a defendant is] dismissed by a substantive pretrial judgment by a court which had jurisdiction to determine the case on its merits."  Id. at 442, 489 S.E.2d at 243.

The Court made clear in its ruling that all the traditional burdens on a person asserting res judicata apply in the criminal context.

> A person seeking to assert *res judicata* as a defense must establish
> identity of:  (1) the remedies sought; (2) the cause of action; (3) the

- 2 -

parties; and (4) the quality of the persons for or against whom the claim is made. [Commonwealth ex. rel. Gray v.] Johnson, 7 Va. App. [614,] 618, 376 S.E.2d [787,] 789 [(1989)]. Further, to assert this defense, the party must establish that "the judgment in the former action [was] rendered *on the merits* by a court of competent jurisdiction." Simmons v. Commonwealth, 252 Va. 118, 120, 475 S.E.2d 806, 807 (1996) (emphasis added).

Id. at 440, 489 S.E.2d at 241. While in Highsmith the Court found all of these elements were proven, id. at 441, 489 S.E.2d at 242, we find appellant has failed to prove all the elements of res judicata in the instant case.

Appellant claims he is "the same person" as Hicks, i.e., is a privy party to Hicks's case. He contends that because they are charged as part of the same mob, they are essentially the same people in these cases. We disagree.

There is no single fixed definition of privity for purposes of *res judicata*. Whether privity exists is determined on a case by case examination of the relationship and interests of the parties. The touchstone of privity for purposes of *res judicata* is that a party's interest is so identical with another that representation by one party is representation of the other's legal right.

State Water Control Bd. v. Smithfield Foods, Inc., 261 Va. 209, 214, 542 S.E.2d 766, 769 (2001).

Clearly the choices that Hicks made in defense of his case are not binding on appellant nor could appellant control Hicks's decisions in the earlier case. See Barnett v. Commonwealth, 348 S.W.2d 834, 835-36 (Ky. 1961) ("For the purpose of the doctrine [of res judicata], a party is one who has a direct interest in the subject matter of the action and has a right to control the proceedings, make defense, examine witnesses, and appeal if an appeal lies."). If Hicks had pled guilty to all offenses, appellant would not be bound by that plea. See State v. Bradley, 234 S.W.2d 556, 558-59 (Mo. 1950) (explaining the co-conspirators' guilty pleas were not binding in Bradley's case as he was not the same party and not in privity with them). If Hicks claimed

self-defense or moved to suppress evidence, the fact finder's ruling on those issues would not bind appellant. We find appellant and Hicks were not "the same person."

In order to apply the doctrine of res judicata to estop a party from relitigating an issue, mutuality must exist.

> The principle of mutuality limits the influence of the initial adjudication "by requiring that to be effective the estoppel of the judgment must be mutual." Norfolk and Western Ry. Co. v. Bailey, 221 Va. 638, 640, 272 S.E.2d 217, 218 (1980). Thus, "a litigant is generally prevented from invoking the preclusive force of a judgment unless he would have been bound had the prior litigation of the issue reached the opposite result." Id. As recently as 1980, this Court made a considered, unanimous decision to resist the so-called "modern trend" and not to abrogate the mutuality requirement. Id. at 641, 272 S.E.2d at 219. Since that decision, other courts, including the Supreme Court of the United States in Haring v. Prosise, 462 U.S. 306, 317 n.10 (1983), have been guided by our position on this subject.

Selected Risks Ins. Co. v. Dean, 233 Va. 260, 264, 355 S.E.2d 579, 581 (1987). Here, if Hicks were convicted of all charges, appellant would not automatically be convicted of the offenses -- the Commonwealth would still have to go forward with its case against appellant. "It is well settled that a judgment of acquittal or conviction does not operate as *res judicata* in the prosecution of another defendant, even though the same transaction is involved." E. H. Schopler, Annotation, Modern Status of Doctrine of Res Judicata in Criminal Cases, 9 A.L.R.3d 203 (2004). See State v. Arevalo, 47 P.3d 866, 869 (N.M. Ct. App. 2002) (explaining the "traditional rule" that a defendant must have been the defendant in a previous criminal case in order to invoke doctrines of collateral estoppel); United States v. Musgrave, 483 F.2d 327, 332 (5th Cir. 1973) ("A judgment of acquittal of one defendant in a prior trial does not operate as *res judicata* in the prosecution of a second defendant in a later trial, even where the same transaction is involved and the second defendant is charged as an accessory to the first."). As no mutuality exists between Hicks's case and appellant's, res judicata does not apply here.

Finally, to apply res judicata in this context would unfairly limit the Commonwealth's ability to prosecute a case. As the United States Supreme Court explained when discussing estoppel in criminal cases involving aiding and abetting charges:

> The absence of these remedial procedures in criminal cases[, such as the ability to secure appellate review where a defendant has been acquitted,] permits juries to acquit out of compassion or compromise or because of "'their assumption of a power which they had no right to exercise, but to which they were disposed through lenity.'" Dunn v. United States, 284 U.S. 390, 393 (1932), quoting Steckler v. United States, 7 F.2d 59, 60 (CA2 1925).

> \* \* \* \* \* \* \*

> But in civil cases, post-trial motions and appellate review provide an aggrieved litigant a remedy; in a criminal case the Government has no similar avenue to correct errors. Under contemporary principles of collateral estoppel, this factor strongly militates against giving an acquittal preclusive effect. See Restatement (Second) of Judgments § 68.1 (Tent. Draft No. 3, 1976) (denying preclusive effect to an unreviewable judgment).

> The application of nonmutual estoppel in criminal cases is also complicated by the existence of rules of evidence and exclusion unique to our criminal law. It is frequently true in criminal cases that evidence inadmissible against one defendant is admissible against another. The exclusionary rule, for example, may bar the Government from introducing evidence against one defendant because that evidence was obtained in violation of his constitutional rights. And the suppression of that evidence may result in an acquittal. The same evidence, however, may be admissible against other parties to the crime "whose rights were [not] violated." Alderman v. United States, 394 U.S. 165, 171-172 (1969). Accord, Rakas v. Illinois, 439 U.S. 128, 134 (1978).

> \* \* \* \* \* \* \*

> Finally, this case involves . . . the important federal interest in the enforcement of the criminal law.

> \* \* \* \* \* \* \*

> The Court of Appeals opinion put the point well:

> "[The] purpose of a criminal court is not to provide a forum for the ascertainment of private rights. Rather it is to vindicate the public interest in the enforcement of the criminal law while at the

- 5 -

same time safeguarding the rights of the individual defendant. The public interest in the accuracy and justice of criminal results is greater than the concern for judicial economy professed in civil cases and we are thus inclined to reject, at least as a general matter, a rule that would spread the effect of an erroneous acquittal to all those who participated in a particular criminal transaction. To plead crowded dockets as an excuse for not trying criminal defendants is in our view neither in the best interests of the courts, nor the public." [United States v. Standefer,] 610 F.2d [1076,] 1093 [(3rd Cir., 1979)].

In short, this criminal case involves "competing policy considerations" that outweigh the economy concerns that undergird the estoppel doctrine.

Standefer v. United States, 447 U.S. 10, 22-25 (1980) (footnotes omitted). See also AKAK, Corp. v. Commonwealth, 38 Va. App. 634, 639-40, 567 S.E.2d 589, 591 (2002) (noting that collateral estoppel does not apply where one party cannot obtain judicial review of the earlier decision).

As we find appellant is not "the same person" as Hicks (i.e., is not in privity with Hicks) and there was no mutuality, we conclude the doctrine of res judicata did not prohibit his conviction.

## II. Cross-Examination on Mental Evaluation

Andre James was charged, along with appellant and several other individuals, with numerous offenses arising out of an incident on August 3, 2002. James's preliminary hearing was not held at the same time as the others, and his trial had not begun prior to his testimony at appellant's trial. The delay apparently arose from the need to have James evaluated to determine if he was competent to stand trial. The evaluation determined he was competent.

At appellant's trial, James testified for the Commonwealth, pursuant to a plea agreement. His testimony placed appellant inside the house where the mob assault occurred on August 3, which contradicted appellant's statements. James admitted he initially told the police that he did not go into the house, and he admitted a prior conviction for grand larceny.

On cross-examination, appellant's attorney asked James if he had been "evaluated to see whether you were competent to stand trial." James acknowledged that he had. Counsel then asked, "Did you meet with a psychologist for evaluation?" The Commonwealth then objected to the relevance of the competency evaluation.[2] The trial court sustained the objection, and no further questions were asked about the evaluation or James's general mental condition.

On appeal, appellant claims the evaluation indicated James was "mildly retarded," which was admissible evidence affecting the credibility of the witness. However, appellant never asked James about retardation during cross-examination. The only questions that appellant attempted to ask related to the existence of a competency evaluation,[3] not to James's general mental state or capacity to understand and observe events. The trial court ruled, "I don't think his evaluation -- since the Commonwealth represented that it came back positive -- really is relevant." The court did not limit appellant's ability to ask James about his memory, ability to understand circumstances, his eyesight, or his truthfulness. Appellant filed a post-trial motion to set aside the jury's verdict, noting, "James'[s] credibility and his intelligence were crucial factors in this case" and arguing appellant was "deprived of his rights to confront and cross-examine his accusers."

As appellant only attempted to present evidence on the existence of a competency evaluation, he has not preserved for appeal any argument regarding questions related to James's mild retardation. See Chase v. Commonwealth, 37 Va. App. 194, 197, 555 S.E.2d 422, 424 (2001) (an assertion that federal rights were violated does not preserve state-based rights

---

[2] The Commonwealth did not make a hearsay objection to the competency evaluation.

[3] A competency evaluation is a report "concerning (i) the defendant's capacity to understand the proceedings against him; (ii) his ability to assist his attorney; and (iii) his need for treatment in the event he is found incompetent." Code § 19.2-169.1.

arguments for appeal).  The trial court was never asked to rule on the admissibility of such evidence.  Gardner v. Commonwealth, 3 Va. App. 418, 423, 350 S.E.2d 229, 232 (1986).

### III.  Fifth Amendment Invocation by Co-conspirator

Mark Smith, Jr., was also charged for the crimes arising out of an incident on August 3. Appellant attempted to call him as a witness.  Smith's attorney, who was contacted via telephone, did not have an objection.  While on the stand, prior to Smith being sworn as a witness and while the jury was excused, the trial court advised him that he did "not have to testify . . . and you should heed the advice of your counsel."  Smith then indicated that he did not want to testify.

Appellant's counsel asked if Smith could be allowed to call his attorney and speak to him.  The court refused, explaining, "I think it's his decision.  He has the right to consult with his lawyer -- and he does or does not have to follow his advice -- but he can cho[o]se not to testify if he wishes.  He has a Constitutional right not to."  The court asked Smith again if he wished to testify, if he had consulted with his attorney and understood that he could choose not to testify. Smith again indicated he did not want to testify.

Appellant asked that the jury be brought back into the courtroom so Smith could invoke his right not to testify before them, and the trial court agreed.  After the jury was seated, the court asked, "Mr. Smith, you've been advised of your rights and it's my understanding you've chosen not to testify; is that correct?"  Smith responded, "Yes, sir."  The court then dismissed him. Appellant's counsel said, "Your Honor, I would just state for the record that I was the one who called him as a witness and he's pleading the Fifth Amendment and refusing to testify."[4]

---

[4] Appellant never objected to the trial court advising Smith of his rights.  His only objection to Smith's invocation of those rights was made after the jury was dismissed, contending Smith had "waived" his Fifth Amendment rights by testifying in an earlier trial.

- 8 -

Appellant filed a post-trial motion to set aside the jury's verdict arguing "Smith waived and lost his Fifth Amendment rights when . . . he entered into an agreement to testify against any codefendant, and doubly waived and lost it when he in fact testified for the Commonwealth against codefendant David A. Hicks . . . fully implicating himself."

Appellant did not argue during the trial that Smith had no right to invoke a Fifth Amendment right not to testify. He did not ask the trial court to investigate the invocation and discover if Smith had "lost" his right. He asked only that Smith be allowed to consult his counsel, which Smith did not indicate he wished to do. Although appellant did make a post-trial motion, at that point the jury was excused and the trial court could not act to correct any error without declaring a mistrial. See Newton v. Commonwealth, 29 Va. App. 433, 459-60, 512 S.E.2d 846, 858-59 (1999) (post-trial motion for a mistrial based on a trial court's response to a question from the jury was not timely and, therefore, not preserved for appeal). Therefore, appellant did not preserve for appeal this argument that Smith improperly invoked his Fifth Amendment right. See Harward v. Commonwealth, 5 Va. App. 468, 473, 364 S.E.2d 511, 513 (1988) ("To be timely, an objection . . . must be made when the occasion arises -- that is, when the evidence is offered, the statement made or the ruling given.").

## IV. Exculpatory Evidence

After the jury returned its verdict, appellant filed a motion for a mistrial and to set aside the jury's verdict. He argued, in part, that the Commonwealth withheld exculpatory information which went to the credibility of its witness, Andre James. Specifically, appellant contended the competency evaluation contained information regarding "diffuse brain damage," James's "second grade age level" and various other problems.[5] The trial court denied appellant's motion

---

[5] Appellant apparently discovered these alleged contents of the evaluation after his trial by talking to James's attorney.

- 9 -

after examining the evaluation *in camera* and finding it contained no exculpatory information. We find the court did not err.

After reviewing the evaluation, which was submitted to this Court under seal, we affirm the trial court's finding. Nothing in the report suggested that James was untruthful, given to making up facts, had impaired memory functions, or had any cognitive impairments. Nothing in the record suggested James's mental conditions make him more likely to lie than anyone else. As no exculpatory information was contained in the evaluation, the failure to turn the document over to appellant did not deprive him of a fair trial. See Currie v. Commonwealth, 30 Va. App. 58, 68, 515 S.E.2d 335, 340 (1999) ("The sealed evidence provides no favorable information to the accused, and its exclusion did not deprive him of a fair trial.").

Additionally, we find appellant has not met his burden on this issue. Where an appellant alleges exculpatory information was not given him by the Commonwealth, he must establish that the information would have aided in his defense and he "must show that a reasonable probability exists that the . . . disclosure would have resulted in a different outcome." Lemons v. Commonwealth, 18 Va. App. 617, 620, 446 S.E.2d 158, 160 (1994). In this case, James's testimony established only that appellant went into the house where the incident on August 3 occurred. However, James was not the only witness to testify that appellant was present. The victim also testified that appellant was in the house and participated in the assault. Appellant himself admitted that he was present outside the house. Given this additional evidence, appellant does not establish to a reasonable degree that the outcome of the trial would have been different if the Commonwealth had disclosed that James was "mildly retarded."

Finally, the jury could determine whether James could understand and answer questions and whether James had the presence of mind to make credible observations, based on their observations of him during his testimony. They did not need specific evidence of experts'

evaluations regarding his education and I.Q. to make this determination.  See Zirkle v. Commonwealth, 189 Va. 862, 870, 55 S.E.2d 24, 29 (1949) ("[Juries] have the right to determine from the appearance of the witnesses on the stand, their manner of testifying, and their apparent candor and fairness, their apparent intelligence, or lack of intelligence, and from all the other surrounding circumstances appearing on the trial, which witnesses are more worthy of credit . . . ."); Street v. Street, 25 Va. App. 380, 389, 488 S.E.2d 665, 669 (1997) (*en banc*) ("Experts do not determine the credibility of a witness.").  The jury also heard impeachment of James -- that he changed his story after talking to the police and that he had a felony conviction for grand larceny.  Again, we are not convinced that information from the competency evaluation would have changed the jury's determination of James's credibility.

We find appellant's arguments are without merit and affirm his conviction.

Affirmed.

Benton, J., concurring, in part, and dissenting, in part.

For the reasons that follow, I would reverse the conviction and remand for a new trial.

I.

I agree with the majority opinion's view that <u>Highsmith v. Commonwealth</u>, 25 Va. App. 434, 489 S.E.2d 239 (1997), the sole case cited by Waters in support of his res judicata argument, does not support Waters's contention that res judicata principles apply in this case. I do not agree, however, that privity was not implicated.

Relying upon well established precedent, we held in <u>Highsmith</u> that "'the doctrines of res judicata and collateral estoppel apply to criminal, as well as civil, proceedings.'" 25 Va. App. at 441, 489 S.E.2d at 242 (citation omitted). <u>See also</u> <u>Hagen v. Utah</u>, 510 U.S. 399, 409 (1994) (noting that "'res judicata is an affirmative defense in both criminal and civil cases'").

> "'*Res judicata* is a judicially created doctrine founded upon the considerations of public policy which favor certainty in the establishment of legal relations, demand an end to litigation, and seek to prevent harassment of parties.'" *Res judicata*, which literally means a "matter adjudged," precludes relitigation of a cause of action once a final determination on the merits has been reached by a court of competent jurisdiction.

<u>CDM Enterprises, Inc. v. Manufactured Housing Board</u>, 32 Va. App. 702, 709, 530 S.E.2d 441, 444 (2000) (citations omitted). "[F]our preclusionary effects [are] embraced by the doctrine of *res judicata*: (1) *res judicata*-bar, (2) merger, (3) direct estoppel, and (4) collateral estoppel." <u>Dotson v. Harman</u>, 232 Va. 402, 405, 350 S.E.2d 642, 644 (1986).

One of the indictments charged Tyrone L. Waters with felony wounding by mob in violation of Code § 18.2-41. This statute provides as follows:

> Any and every person composing a mob which shall maliciously or unlawfully shoot, stab, cut or wound any person, or by any means cause him bodily injury with intent to maim, disable, disfigure or kill him, shall be guilty of a Class 3 felony.

Code § 18.2-41.

The record indicates that the Commonwealth had earlier prosecuted David Allen Hicks, a codefendant and member of the same mob, under an indictment that also charged Hicks with felony wounding by mob, a violation of Code § 18.2-41. At Hicks's trial, the judge found that the mob committed a simple assault and battery upon Claude Shifflett and, therefore, convicted Hicks of a violation of Code § 18.2-42, which provides that "[a]ny and every person composing a mob which shall commit a simple assault or battery shall be guilty of a Class 1 misdemeanor." Citing this conviction, Waters's attorney filed a motion prior to Waters's trial, "to reduce . . . the charge of felony assault by mob to misdemeanor assault by mob, upon the application of constitutional Double [Jeopardy] in the form of Res judicata." The trial judge denied the motion. At the conclusion of the trial, the jury convicted Waters only of violating Code § 18.2-41.

"It is the general rule that the acquittal of one person cannot be pleaded as a bar to the prosecution of another." State v. Hentschel, 101 A.2d 456, 457 (N.H. 1953). This rule is grounded, however, upon the principle that "'the guilt of the second defendant depends on proof of his own illegal activity and intent.'" Id. (citation omitted). Thus, the general rule may give way "where the crime involves concerted activity [such] that the general rule does not apply." Id. See United States v. Austin-Bagley, 31 F.2d 229, 233 (2d Cir. 1929) (noting that the plea may be invoked when the acquittal of all but one party to a conspiracy has occurred and the defendant is being prosecuted as the remaining conspirator).

(A)

"[F]or purposes of *res judicata*, a 'cause of action' involves an assertion of *particular legal rights* arising out of a definable factual transaction." Davis v. Marshall Homes, Inc., 265 Va. 159, 172, 576 S.E.2d 504, 510 (2003). The indictment in this case charged Waters with the same concerted action that was the basis for its prosecution of the codefendant Hicks, who earlier was acquitted of the felony and was convicted of the misdemeanor. The evidence proved Hicks

wielded the bat during the attack on Shifflett, whom Waters is charged with striking with his fist.

In Hicks's trial, the judge found that the mob committed simple assault or battery, see Code

§ 18.2-42, and, thus, found that the evidence failed to prove the requisite intent under Code

§ 18.2-41. In short, the trial judge found that a mob existed but found that the act was a simple

assault, not a wounding resulting from a malicious intent.

> Discussing the two statutes, the Supreme Court recently explained as follows:

> > In order to sustain a conviction of maiming by mob under Code § 18.2-41, the evidence must establish that the accused was a member of a group composing a mob; that the mob caused the victim bodily injury; and that the mob acted with the malicious intent "to maim, disable, disfigure or kill" the victim. In order to sustain a conviction of assault or battery by mob under Code § 18.2-42, the evidence must establish that the accused was a member of a mob and that the mob committed simple assault or battery. "The requisite intent under Code § 18.2-41 to maliciously maim, disable, disfigure or kill is the only difference between the two offenses."

Commonwealth v. Leal, 265 Va. 142, 146, 574 S.E.2d 285, 287-88 (2003) (citation omitted).

See Harrell v. Commonwealth, 11 Va. App. 1, 6, 396 S.E.2d 680, 682 (1990) (holding that "[t]he

statutory definition of a mob [in Code § 18.2-38] requires that the act of assembling be done for

a specific purpose and with a specific intent"). Thus, in a prosecution under Code § 18.2-41, an

individual intent is not the guiding issue because "criminal accountability flows from being a

member of the mob." Id. at 8, 396 S.E.2d at 683. The graveman of the offense is the conduct of

the mob and the intent of the mob.

> The trial judge's ruling in Hick's prosecution, that the concerted action was of the

non-felonious category, is significant.

> > [O]nce the group assembled comprises a mob, if the assault or battery which is committed is a simple assault or battery, then because of Code § 18.2-57, every person composing the mob becomes criminally culpable even though the member may not have actively encouraged, aided, or countenanced the act. Thus, criminal accountability flows from being a member of the mob,

regardless of whether the member aids and abets in the assault and battery. The characterization of the group action as the act of a mob has added significance because not only did it affect the class of felony for which [the accused] could have been convicted, but also meant that he could have been convicted even if the jury had believed that a person other than [the accused] had struck [the victim] with the club. Therefore, the question of whether the evidence was sufficient to establish that this was a mob offense is significant as to both the theory of guilt and the class of felony for which [the accused] was prosecuted.

Id. When the Commonwealth charged Hicks and Waters with being part of the same mob, the causes of action essentially were alleged to be the same for res judicata purposes.

(B)

Res judicata applies to the actual parties in a case and to those in privity with them. See City of Virginia Beach v. Harris, 259 Va. 220, 229, 523 S.E.2d 239, 243 (2000). "In other words, the doctrine applies to anyone "'so identified in interest with [a party] that he represents the same legal right, precisely the same question, particular controversy, or issue.'" CDM Enterprises, Inc., 32 Va. App. at 710, 530 S.E.2d at 445 (citation omitted). "Privies are 'persons connected together or having a mutual interest in the same action or thing, by some relation other than that of actual contract between them.'" Padgett v. Bon Air Realty Co., 150 Va. 841, 847, 143 S.E. 291, 293 (1928) (citation omitted).

"[A] determination of just who are privies requires a careful examination into the circumstances of each case." Nero v. Ferris, 222 Va. 807, 813, 284 S.E.2d 828, 831 (1981). As previously explained, Waters and Hicks were codefendants in prosecutions for violating Code § 18.2-41, felony wounding by mob. While they were each tried separately for the crime, both Waters and Hicks were indicted on the same charge. The Commonwealth alleged they were both part of the same mob; therefore, the Commonwealth had to prove the mob caused Shifflett's bodily injury and the mob acted with malicious intent to maim, disable, disfigure, or kill

- 15 -

Shifflett.  Thus, Waters and Hicks's interests are so connected that they are in privity with each other for res judicata purposes.

(C)

I believe that the determinative issue in this case, which Waters fails to address, is not cause of action or privity but, rather, the requirement of mutuality.  The Supreme Court of the United States has held that the doctrine of nonmutual estoppel does not apply against the government to preclude relitigation of issues when the doctrine of collateral estoppel is invoked in a criminal case and the parties to the two proceedings are not the same.  See Standefer v. United States, 447 U.S. 10, 21-25 (1980).  I believe that the rationale for this holding logically applies in criminal cases where the issue is res judicata.  But see Nevada v. United States, 463 U.S. 110, 143 (1983) (applying the principles of res judicata against the government in a civil case where no mutuality existed).

Moreover, in view of the Supreme Court of Virginia's "considered, unanimous decision to resist the so-called 'modern trend' and not to abrogate the mutuality requirement [of collateral estoppel]," Selected Risks Ins. Co. v. Dean, 233 Va. 260, 264, 355 S.E.2d 579, 581 (1987), I believe the same principle would apply to bar the doctrine of res judicata in criminal cases in Virginia where mutuality does not exist.  Because of this requirement of mutuality of estoppel in the application of res judicata in criminal prosecutions, I concur in the holding that Waters cannot invoke the bar of res judicata as a defense.  Simply put, Waters has failed to adequately support his argument that the absence of mutuality does not prevent the defensive use of res judicata against the government in a criminal prosecution.

II.

Although the jury convicted Waters only of violating Code § 18.2-41, the Commonwealth prosecuted him for numerous offenses.  The Commonwealth also charged Andre

James with numerous offenses arising out of the same incident on August 3, 2002 and later obtained James's agreement to testify against Waters. The Commonwealth failed, however, to disclose to Waters information that was revealed when James was evaluated by a psychologist for competency to stand trial. Moreover, when Waters sought to cross-examine James at trial regarding the evaluation, the judge sustained the prosecutor's objection and excluded the testimony as irrelevant. I would hold that the trial judge erred in excluding the evidence and in denying the post-trial motions for a mistrial.

The record established that when the police first questioned James he told the police he did not enter the house and did not know Waters. The prosecutor delivered to Waters the statement James gave to the police, but the prosecutor did not inform Waters either that James told the prosecutor he lied when he gave the statement or that James would testify as to a different version of events. Contrary to his statement, James testified that he lied to the police and that he decided to be truthful and to assist the Commonwealth after he was identified as a participant. He also testified that Waters was in the bathroom of the house where Shifflett was beaten.

To counter the prosecutor's objection, Waters's attorney proffered to the trial judge that James had undergone a competency evaluation and that his mental ability was relevant because it "has to do with [James's] ability to recall events, to accurately notice things." He proffered that it was "evidence that can be used to impeach a witness." Accepting the prosecutor's argument that Waters was not entitled to the "mental evaluation when [it comes] back clean," the trial judge barred Waters from raising this issue for the jury's consideration. Later, at the post-trial hearing, Waters's attorney represented to the trial judge that James's attorney said the evaluation report disclosed that James has "diffuse brain damage," functions at a second grade level, is "borderline mentally retarded," and has taken various medications for his mental difficulties.

The trial judge considered the report *in camera* and disclosed that James's scores on the report indicate "mildly retarded intellectual functioning," but the judge concluded this was not "exculpatory."

"Combined, the rights to compulsory process, confrontation and due process give the defendant a constitutional right to present relevant evidence." Neeley v. Commonwealth, 17 Va App. 349, 356, 437 S.E.2d 721, 725 (1993). Thus, we have held that

> a defendant cannot be deprived of the opportunity to put his evidence and version of the facts before the jury so "as to deprive a criminal defendant of his Sixth Amendment right to confront and cross-examine his accuser and to call witnesses in his defense," or simply because the trial court finds the prosecutrix's version more credible than the defendant.

League v. Commonwealth, 9 Va. App. 199, 205, 385 S.E.2d 232, 236 (1989) (citation omitted). The opportunity to present a complete defense "would be an empty one if the State were permitted to exclude competent, reliable evidence bearing on . . . credibility . . . when such evidence is central to the defendant's claim of innocence." Crane v. Kentucky, 476 U.S. 683, 690 (1986). These principles have heightened importance when the witness is charged as an accomplice.

> Any evidence is admissible which tends to affect the credibility of accomplices or the weight of their testimony by showing what influences, if any, were brought to bear upon them. . . . Defense counsel should be afforded great latitude in cross-examining accomplices testifying against a defendant.

Woody v. Commonwealth, 214 Va. 296, 297-98, 199 S.E.2d 529, 531 (1973).

The record on appeal establishes that the evaluation report does indeed disclose facts as represented by Waters's attorney to the trial judge. That information was germane to James's credibility and ability accurately to perceive the events at issue. The trial judge's error in not allowing Waters to question James about his psychological examination and the results of that examination deprived Waters of the opportunity to expose to the jury matters that bore on

- 18 -

James's credibility and ability to perceive the facts. "'[T]he main and essential purpose of confrontation is *to secure for the opponent the opportunity of cross-examination*.'" Delaware v. Van Arsdall, 475 U.S. 673, 678 (1986). "Confrontation means more than being allowed to confront the witness physically." Davis v. Alaska, 415 U.S. 308, 315 (1974). Indeed, it is fundamental that "[c]ross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested." Id. at 316. The importance of cross-examination bearing on credibility cannot be overstated.

> The credibility of witnesses is a question exclusively for the jury, and where a number of witnesses testify directly opposite to each other, the jury is not bound to regard the weight of the evidence as equally balanced, they have the right to determine from the appearance of the witnesses on the stand, their manner of testifying, and their apparent candor and fairness, their apparent intelligence, or lack of intelligence, and from all the other surrounding circumstances appearing on the trial, which witnesses are more worthy of credit, and to give credit accordingly.

Zirkle v. Commonwealth, 189 Va. 862, 870, 55 S.E.2d 24, 29 (1949).

At trial, Shifflett testified that eight men chased him up the stairs and into a bathroom, where they began to punch him, kick him, and hit him with baseball bats. He testified that Waters, whom he did not previously know, "thr[e]w a punch at [him] when [he] was in and out trying to dodge the baseball bat." The prosecutor stipulated, however, that Shifflett "did not say [at the preliminary hearing] that [Waters] hit him."

James testified that when the police first questioned him he told them he did not enter the residence. Thus, his testimony at trial was a significant departure from his initial statement to the police. The jury's determination of his credibility likely had a significant bearing upon how it assessed the strength of Shifflett's trial testimony, which was consistent with James's testimony but was also significantly different than Shifflett's earlier sworn testimony. I would hold that the trial judge erred in barring Waters from examining James about matters bearing on his

intelligence, his ability to perceive events, and, therefore, his credibility.  In view of the conflicts in the witnesses' prior inconsistent statements and sworn testimony, this error was not harmless.

Likewise, I would hold that the Commonwealth's failure to disclose the mental evaluation report constituted a <u>Brady</u> violation.  <u>See</u> <u>Brady v. Maryland</u>, 373 U.S. 83, 87 (1963). The Supreme Court has rejected any distinction between impeachment and exculpatory evidence, holding that "impeachment evidence . . . as well as exculpatory evidence falls within the <u>Brady</u> rule."  <u>United States v. Bagley</u>, 473 U.S. 667, 676 (1985).  The Supreme Court also has held that "if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed."  <u>United States v. Agurs</u>, 427 U.S. 97, 112 (1976).  For the reasons I have discussed above, the weakness in the Commonwealth's evidence, flowing from the testimony of both Shifflett and James, leaves in doubt whether the jury would have found the same verdict had Waters been permitted to properly cross-examine James.  I would hold, therefore, that the evidentiary suppression of the evidence "undermines confidence in the outcome of the trial."  <u>Bagley</u>, 473 U.S. at 678.

For these reasons, I would reverse the conviction and remand for a new trial.