COURT OF APPEALS OF VIRGINIA


Present:   Judges Benton, Frank and Felton
Argued at Chesapeake, Virginia


LAMAR EDWARD BARNES
                                                    MEMORANDUM OPINION* BY
v.        Record No. 2743-03-1                      JUDGE JAMES W. BENTON, JR.
                                                         MAY 10, 2005
COMMONWEALTH OF VIRGINIA


             FROM THE CIRCUIT COURT OF THE CITY OF PORTSMOUTH
                          Johnny E. Morrison, Judge

             James O. Broccoletti (Zoby and Broccoletti, P.C., on brief), for
             appellant.

             Kathleen B. Martin, Assistant Attorney General (Jerry W. Kilgore,
             Attorney General, on brief), for appellee.


        A jury convicted Lamar Edward Barnes of first-degree murder, use of a firearm in the

commission of murder, malicious wounding, and use of a firearm in the commission of malicious

wounding.  Barnes contends the trial judge erred (i) in admitting irrelevant and prejudicial testimony

concerning the deceased victim's pregnancy; and (ii) in asking the jury to return to the jury room to

"revisit" the recommended sentences after they had been announced in open court.  For the reasons

that follow, we hold that the trial judge erred in admitting portions of the testimony, but that the

error was harmless.  We also hold that the trial judge was within his power to give the jury an

opportunity to correct what he perceived to be a clerical error in the verdicts.

                                          I.

        On a late afternoon, Mike Artis and Lamar Edward Barnes arrived at Mark King's residence

for a visit.  King was in the residence with his girlfriend Amy McCrae, Adam Gregory, and Chris

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

Hopkins. King testified he watched television while Gregory, Hopkins, Artis, and Barnes were in a back room playing video games. He testified that he had known all four of the male visitors approximately one and a half to two years and that he knew Barnes only by the name "JoJo."

Gregory and Hopkins testified that Artis, whom they had previously known, arrived at King's residence with a person they had not previously met. They identified Barnes in court as the person who accompanied Artis, and Hopkins testified that Barnes was introduced to him as "JoJo." Gregory and Hopkins also testified they went into the back room with Artis and Barnes and, for fifteen to twenty minutes, played video games and smoked marijuana.

King later entered the back room, threw a large wad of cash onto a table, and said, "Don't you wish y'all could roll like this?" He then picked up the cash and exited the room, leaving the four male visitors to continue playing video games. Five to fifteen minutes after King exited the back room, Barnes walked to the living room where King was sitting. King testified Barnes said, "Mark, check this out." When King turned to Barnes, he saw Barnes pointing a gun at his head. Barnes then shot him in the head. King did not remember the gun being fired and testified he still has the "bullet lodged in [his] brain."

In the back room, Hopkins heard "two loud pops" in quick succession, but he did not recognize the sounds as gunfire and continued playing a video game. Gregory testified he recognized the sounds as gunshots and ran from the room with Artis following closely behind him. Gregory saw McCrae kneeling in front of the kitchen door and Barnes standing over her. He testified that Barnes put a gun to the back of McCrae's head and said, "Don't run from me, bitch." Barnes then shot her in the head.

Gregory testified he retreated into the back room, locked the door, and yelled to Hopkins, "Get out of the house, get out of the house." As Gregory broke a window pane and attempted to

exit the house with Hopkins, Artis broke through the door. Artis pushed Hopkins into Gregory and began punching and stabbing them.

A handyman, who had been erecting a fence in the backyard, heard the gunshots and breaking glass. He ran into the residence, saw McCrae on the floor, and noticed a man outside the front door. He then went to the back room and pulled Artis away from Hopkins. The handyman gave chase as Artis fled but was unable to catch him.

When police and rescue personnel arrived, they transported McCrae to the hospital. McCrae's baby was delivered by cesarean section. The baby lived, but McCrae died.

At the close of the Commonwealth's evidence, the trial judge granted Barnes's motion to strike the charges of robbery and use of a firearm in the commission of a robbery. The trial judge also granted Barnes's motion to reduce the homicide charge from capital murder to first degree murder. At the conclusion of all the evidence, the jury convicted Barnes of first-degree murder, use of a firearm in the commission of a murder, malicious wounding, and use of a firearm in the commission of malicious wounding.

## II.

Barnes contends the trial judge abused his discretion by allowing McCrae's mother to testify about McCrae's pregnancy, planning a baby shower, and the mother's visit to the hospital. He argues her testimony was irrelevant and prejudicial. The Commonwealth contends that Barnes failed to argue at trial that the evidence was irrelevant and prejudicial, but that, in any event, the error was harmless.

For evidence to be admissible, it must be relevant. That is, it must tend "to prove a material fact" at issue. Evans v. Commonwealth, 14 Va. App. 118, 122, 415 S.E.2d 851, 853-54 (1992). A fact is "material" if it tends to prove an element of an offense or defense. Johnson v. Commonwealth, 2 Va. App. 598, 601, 347 S.E.2d 163, 165 (1986). In our review of the trial

judge's decision to admit evidence over an objection, we are mindful that "[t]he admissibility of evidence is within the broad discretion of the trial court, and a ruling will not be disturbed on appeal in the absence of an abuse of discretion." Jones v. Commonwealth, 38 Va. App. 231, 236, 563 S.E.2d 364, 366 (2002).

McCrae's mother testified about her conversation with McCrae before McCrae was killed. She testified they were organizing a baby shower and planning to mail invitations to the baby shower. She then identified the time of the conversation. After this, the following occurred:

> [Prosecutor]: You said you were talking about mailing invitations to a baby shower?
>
> [Barnes's attorney]: I object to that. I let it go, but there is no relevance to that, Judge.

McCrae's mother then discussed McCrae's pregnancy and her "due date." After this testimony, the following colloquy ensued:

> [Prosecutor]: How soon after the conversation with [McCrae] did you receive another call about going to the hospital?
>
> A: About 45 minutes.
>
> [Barnes's attorney]: Judge, I object. It's simply not relevant.
>
> [The Judge]: Y'all come up here.
>
> [Barnes's attorney]: She's trying to inflame the jury.

The judge held a sidebar conference, which was not transcribed, and the questioning continued:

> Q: Did you go to the hospital ma'am?
>
> A: Yes.
>
> Q: Which hospital?
>
> A: Norfolk General.
>
> Q: And when you arrived at the hospital, were you able to see [McCrae]?
>
> A: They asked me if I wanted to and I told them I didn't want to.

- 4 -

Q: By that point was [she] alive?

A: No.

Q: Were you able to see the baby?

A: Uh-huh.

[Barnes's attorney]: I object to that, Judge. That's not relevant.

[The Judge]: Overruled . . . .

We agree with Barnes that this evidence had no relevance to proving any of the charges against him. Thus, we hold that the trial judge abused his discretion by admitting it. We agree with the Commonwealth, however, that the error was harmless.

Our review for harmless error is guided by the statutory standard for nonconstitutional error.

> When it plainly appears from the record and the evidence given at the trial that the parties have had a fair trial on the merits and substantial justice has been reached, no judgment shall be arrested or reversed.

Code § 8.01-678. Applying this statute, the Supreme Court has adopted the following test for nonconstitutional harmless error:

> If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but slight effect, the verdict and the judgment should stand . . . . But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. . . . If so, or if one is left in grave doubt, the conviction cannot stand.

Clay v. Commonwealth, 262 Va. 253, 260, 546 S.E.2d 728, 731-32 (2001) (quoting Kotteakos v. United States, 328 U.S. 750, 764-65 (1946)).

Barnes argues that the details about McCrae's pregnancy prejudiced the jury and contributed to the jury's finding that it was he, and not another individual who committed the murders. We disagree. The jury already had heard testimony, without objection, from other

sources about McCrae's pregnancy. Prior to McCrae's mother's testimony, a paramedic testified that McCrae had been seven and a half months pregnant when she died and that her baby had been delivered alive by cesarean section. The jury also heard King, the baby's father, testify that McCrae had been seven and a half months pregnant. The jury had seen a photo of McCrae while she was pregnant. Although the mother's testimony was certainly emotional, it was cumulative of this other testimony about McCrae's pregnancy and was not so detailed as to distract the jury from the issues in this case.

We acknowledge that the issue of identity was contested at trial. Artis testified that another man, not Barnes, was the person who shot McCrae. In view of Artis's testimony that Barnes, his cousin, was not the man who accompanied him to King's residence, the jury had to make a credibility determination. The jury heard Artis testify, however, that he had entered into a plea agreement with the Commonwealth and had identified Barnes as the person who shot McCrae. During the plea agreement process, he admitted Barnes held the gun over McCrae while saying, "Where is the stash? Where is the stash?" He also admitted saying that Barnes showed him a "wad of cash" and that Barnes indicated he had taken the money from King. He further admitted saying Barnes displayed the same gun two days after the killing and told him to identify another man as the perpetrator. In view of this substantial impeachment of Artis's testimony, we do not believe that the record remotely establishes that the mother's testimony about the baby shower and her trip to the hospital had the effect of prejudicing the jury into believing that Barnes, and not some other person, committed the crimes.

The positive evidence of Barnes's identity was overwhelming. King had known Barnes for almost two years, and he identified Barnes as the person who entered the residence with Artis and shot him. In addition to King's identification, Gregory and Hopkins readily identified Barnes at the trial. While Gregory and Hopkins could not identify Barnes in a photographic

- 6 -

lineup prior to trial, the jury heard evidence that Barnes had been in the residence for at least twenty minutes prior to the murder. During that time, Barnes was in the presence of Gregory and Hopkins and was playing video games in a room with them. In view of this overwhelming evidence of identity, we cannot say the testimony by McCrae's mother was so impressive in this case as to prejudice the jury and to cause the jury to mistakenly believe Barnes was the criminal.

### III.

Barnes contends the trial judge erred in ordering the jury to re-deliberate its sentences after the clerk had announced the sentences in open court. Barnes argues that the trial judge had no authority to order the jury to change the verdict, that the jury was no longer empowered to enter another sentence, and that the trial judge's order "disenfranchised" the jury by telling it what to do.

The rule Virginia courts have long adhered to is "that once a jury is discharged and leaves the presence of the court, it cannot be reassembled to correct a substantive defect in its verdict." LeMelle v. Commonwealth, 225 Va. 322, 324, 302 S.E.2d 38, 39 (1983). See also Melton v. Commonwealth, 132 Va. 703, 712, 111 S.E. 291, 294 (1922) (holding that "[w]hen the court announces [the jury's] discharge and they leave the presence of the court, their functions as jurors have ended, and neither with nor without the consent of the court can they amend or alter their verdict"). These cases apply this rule only if the jury has been discharged and leaves the courtroom.

Since Melton and LeMelle, we have decided Gardner v. Commonwealth, 3 Va. App. 418, 350 S.E.2d 229 (1986), a case in which the jury had been discharged but had not left the courtroom. When the trial judge polled the jury following its guilty verdict in Gardner, one juror answered that he did not support the verdict. 3 Va. App. at 422, 350 S.E.2d at 231. After granting the defendant a mistrial, the trial judge discharged the jury. However, before the jury

- 7 -

left the courtroom, the trial judge ordered the jurors to reassemble, gave the jury an <u>Allen</u> instruction (<u>Allen v. United States</u>, 164 U.S. 492 (1896)), and directed them to resume deliberations. <u>Gardner</u>, 3 Va. App. at 423, 350 S.E.2d at 231-32. The jurors deliberated again and returned a unanimous guilty verdict. <u>Id.</u> We held that the judge did not err in ordering the jury to reassemble. Citing <u>Melton</u> and <u>LeMelle</u>, we reasoned that the trial judge retained the power to reassemble the jury for further deliberations because the jury was still in the courtroom. <u>Gardner</u>, 3 Va. App. at 425, 350 S.E.2d 232. <u>See also</u> <u>Quesinberry v. Commonwealth</u>, 241 Va. 364, 375-77, 402 S.E.2d 218, 225-226 (1991) (holding that the trial judge did not err in re-instructing jury after it rendered a verdict and requiring it to renew its deliberation where an essential instruction earlier had been omitted).

The trial judge in this case asked the jury to do something far less drastic than in <u>Gardner</u>. The record clearly established that the jury had recommended inappropriate sentences on the verdict forms. The mistake was understandable, given that the verdicts were rendered around midnight and that the verdict forms referred to the Counts as charged in the indictments, without identifying by name the specific offenses. The error was immediately obvious because the recommended sentence for Count Two (the use of a firearm in the commission of murder charge) exceeded by fifteen years the maximum sentence the jury could impose. The recommended sentence for Count Five (the malicious wounding charge) was two years less than the statutory minimum sentence.

Citing <u>Deagle v. Commonwealth</u>, 214 Va. 304, 199 S.E.2d 509 (1973), Barnes contends the trial judge only had the power to excise the excessive portion of the sentence for Count Two. In <u>Deagle</u>, the jury returned both a ten-year sentence and a $1,000 fine against the defendant; either sentence was valid, but not both. The Supreme Court held that a court "<u>may</u> impose a valid sentence in substitution for one that is void." 214 Va. at 305, 199 S.E.2d at 510 (emphasis

- 8 -

added).  Assuming that the jury wanted to impose the greater sentence, the Supreme Court affirmed the trial judge's decision to "delete the fines and impos[e] the penitentiary sentences," reasoning that "common sense and reason dictate that the jury, if it had been required to choose between the two punishments it had fixed, would have imposed the greater . . . sentence, and not the lesser, the fine." Id. at 306, 199 S.E.2d at 511. Deagle does not limit the trial judge to this remedy.

We hold that the trial judge acted properly in this case and within his power. He did not usurp the jury's power by substituting what he believed to be a correct sentence for an incorrect one. He did not order the jury to comply with his previous instructions. Instead, with minimal time and effort, the trial judge allowed the jury to fulfill its role to determine Barnes's sentences by simply asking them to "revisit" the verdict forms. In doing so, he was able to ascertain if what he suspected was true:  that they made a clerical error when completing the verdict forms. Indeed, the jury then rendered sentences that were within the parameters of the trial judge's original instructions. The commonsense remedy was appropriate, and "[t]he sanctity of jury trials [was not] thus subjected to the hazard of suspicion." Melton, 132 Va. at 712, 111 S.E. at 294.

For these reasons, we affirm the convictions.

Affirmed.